BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
FERDEZA ZEKIRI (335507)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com
zekiri@whafh.com

GREGORY M. NESPOLE
DANIEL TEPPER
CORREY A. SUK
SIDHARTH KAKKAR
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 17th Floor
New York, NY 10004
T. 212.363.7500
F. 212.363.7171
gnespole@zlk.com
dtepper@zlk.com
csuk@zlk.com
skakkar@zlk.com

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOEL NEWMAN, Derivatively on Behalf of SENTINELONE, INC., <br><br> Plaintiff, <br><br> v. <br><br> TOMER WEINGARTEN, DAVID BERNHARDT, CHARLENE T. BEGLEY, AARON HUGHES, MARK S. PEEK, ANA G. PINCZUK, DANIEL SCHEINMANN, TEDDI WARDI, and JEFFREY W. YABUKI, <br><br> Individual Defendants, <br> -and- <br><br> SENTINELONE, INC., <br><br> Nominal Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. <br> ) <br> ) **VERIFIED STOCKHOLDER** <br> ) **DERIVATIVE COMPLAINT** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Plaintiff Joel Newman ("**Plaintiff**"), by his attorneys, derivatively and on behalf of Nominal Defendant SentinelOne, Inc. ("**SentinelOne**" or the "**Company**") submits this Verified Stockholder Derivative Complaint against individual defendants Tomer Weingarten, David Bernhardt, Charlene T. Begley, Aaron Hughes, Mark S. Peek, Ana G. Pinczuk, Daniel Scheinmann, Teddi Wardi, and Jeffrey W. Yabuki for breaches of their fiduciary duties as directors and/or officers of SentinelOne, unjust enrichment, and violation of Section 20(a) of the Securities Exchange Act of 1934 (the "**Exchange Act**"). Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("**SEC**") and a review of news reports, press releases, and other publicly available sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1. This is a stockholder derivative action on behalf of Nominal Defendant SentinelOne against members of its board of directors (the "**Board**") and management. The wrongdoing alleged herein has caused substantial damage to SentinelOne's reputation, goodwill, and standing in the business community and has exposed SentinelOne to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged SentinelOne in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2. This action seeks to remedy wrongdoing committed by SentinelOne's directors and officers from June 1, 2022 through the present (the "**Relevant Period**").

3.  SentinelOne is a cybersecurity company that pioneered the world's first purpose-built AI-powered Extended Detection and Response ("**XDR**") platform (the "**Singularity Platform**"). The Company claims that its Singularity Platform defends instantly against cyberattacks, performing at a faster speed, greater scale, and higher accuracy than otherwise possible from humans.

4.  SentinelOne offers its products and services via subscription contracts with durations ranging from one to three years. The Company generally recognizes revenue in accordance with Generally Accepted Accounting Principles ("**GAAP**"). The Company also measures non-GAAP "key business metrics," one of which is its Annualized Recurring Revenue ("**ARR**"). The Company defines ARR as "the annualized revenue run rate of our subscription and capacity contracts at the end of a reporting period, assuming contracts are renewed on their existing terms for customers that are under contracts with us." Although Defendants have stated that ARR is not a forecast of future revenue, they nonetheless represented to investors throughout the Relevant Period that SentinelOne's revenue projections and ARR tracked each other closely.

5.  After the market closed on June 1, 2023, the Company announced that it was revising downwards its previously reported ARR figures and ARR projections. The Company published a press release titled "SentinelOne announces First Quarter Fiscal Year 2024 Financial Results."[1] Therein, the Company disclosed that, "[a]s a result of a change in methodology and correction of historical inaccuracies…we made a one-time adjustment to ARR of $27.0 million or approximately 5% of total ARR" as compared to previously reported ARR figures from FY 2023

---

[1] *SentinelOne Announces First Quarter Fiscal Year 2024 Financial Results*, SENTINELONE (June 1, 2023), https://investors.sentinelone.com/press-releases/news-details/2023/SentinelOne-Announces-First-Quarter-Fiscal-Year-2024-Financial-Results/default.aspx.

(ended January 31, 2023).[2] Defendants also announced, among other things, that they were materially slashing the Company's projected ARR growth for the 2024 fiscal year (ending January 31, 2024) by roughly 25%, and revised the Company's fiscal year 2024 revenue guidance downward from a range of $631 million to $640 million to a range of $590 million to $600 million.

6.     That same day, SentinelOne explained in a shareholder letter signed by Defendant Weingarten and Bernhardt that:

> In light of the current macro environment, we expect [] lower usage and consumption trends to persist. Due to this new dynamic, we have changed the methodology for calculating ARR consumption and usage-based agreements to reflect committed contract values. This provides a cleaner view of growth for fiscal 24 and beyond. By making this change now, we expect ARR and revenue to be more closely aligned. ***As we reviewed the methodology, we also discovered historical upsell and renewal according inaccuracies relating to ARR on certain subscription and consumption contracts, which are now corrected.***[3]

> Overall, this adjustment resulted in a one-time ARR reduction of $27  million or approximately 5% of ARR, resulting in Q4 fiscal '23 ending ARR of $522 million. We are applying a comparable estimated adjustment to the remaining quarters in fiscal year 23, which we believe is a reasonable approximation of the impact in those periods.

7.     With regard to upselling, Defendants Weingarten and Bernhardt explained: "what we were seeing was we had upsell [situations] that included a renewal, and we were adding that to the historical ARR versus just adding the upsell component of it." In other words, if a customer renewed a contract, but with additional services (an "upsell"), both the cost of the additional services ***and*** the value of the historical contract would be included in the Company's ARR

---

[2] SentinelOne's fiscal quarters and year do not track the calendar year's quarters. Instead, SentinelOne's fiscal year begins on February 1 (rather than January 1); for example, its Q1 FY2023 ended April 30, 2022, its Q2 FY2023 ended July 31, 2022, its Q3 FY2023 ended October 31, 2022, and its Q4 FY2023 (and full 2023 fiscal year) ended January 31, 2023. Accordingly, almost all events that occurred in calendar 2022 actually occurred in SentinelOne's fiscal 2023 (and similarly, almost all events that have occurred in calendar 2023 have occurred in SentinelOne's fiscal 2024).

[3] Unless otherwise noted, all emphasis herein has been added.

calculations, even though ARR had previously accounted for the historical contract price. This practice of double-counting further inflated both SentinelOne's reported ARR and the Defendants' ARR projections.

8.      On this news, SentinelOne's stock price declined by $7.28 per share – *or more then 35%* – to close at $13.44 per share on June 2, 2023. As one analyst noted in downgrading SentinelOne's shares, "[*the Company's*] *narrative is too hard for us to defend.*"

9.      As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct these false and misleading statements and omissions of material fact. Specifically, the Individual Defendants failed to disclose to investors that: (i) SentinelOne lacked effective controls over accounting and financial reporting; (ii) the Company's ARR was overstated; (iii) the Company's ARR projections were inflated; and (iv) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

10.      Moreover, during the Relevant Period, Defendants Weingarten and Bernhardt took advantage of their knowledge of adverse material nonpublic information ("**MNPI**") to sell portions of their personal holdings of SentinelOne's stock at inflated prices. For instance, Defendant Weingarten sold 1,420,447 of his SentinelOne's shares at inflated prices during the Relevant Period, reaping illicit insider selling proceeds of *almost $23 million*.

11.      As detailed herein, and as alleged in the ongoing federal securities class action pending in the United States District Court for the Northern District of California, styled *In Re SentinelOne, Inc. Securities Litigation*, Case No. 4:23-CV-02786-HSG, (the "**Federal Securities Class Action**"), SentinelOne's officers and directors substantially damaged the Company by issuing the false and misleading statements set forth herein.

12.     Through this derivative action, Plaintiff seeks to recover damages to SentinelOne caused by the misconduct alleged herein.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1).  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

15.     The court has personal jurisdiction over each of the Defendants because each Defendant has minimum contacts with this District to justify the exercise of jurisdiction over them.

16.     Venue is proper in this District because the Company is incorporated in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## THE PARTIES

### Plaintiff

17.     Plaintiff Joel Newman is and has continuously been a stockholder of SentinelOne during the wrongdoing complained of herein.

### Nominal Defendant

18.     Defendant SentinelOne is a Delaware corporation with its principal executive offices located at 444 Castro Street, Suite 400, Mountain View, California 94041. SentinelOne's shares trade on the Nasdaq Global Select Market ("**NASDAQ**") under the ticker symbol "S."

### Individual Defendants

19.     Defendant Tomer Weingarten ("**Weingarten**") is SentinelOne's co-founder and

has served as the Company's Chief Executive Officer ("**CEO**") since its inception in January 2013. He has also served as President of the Company since November 2018 and Chairman of the Board since March 2021. In 2022 and 20233, Weingarten received nearly $109 million in compensation from the Company. Moreover, during the Relevant Period, Weingarten sold nearly $23 million of his person holdings of SentinelOne common stock on the basis of adverse MNPI.

20.     Defendant David Bernhardt ("**Bernhardt**") has served as SentinelOne's Chief Financial Officer ("**CFO**") since September 2020. In 2022 and 2023, Bernhardt received more than $6.6 million in total compensation from the Company. Moreover, during the Relevant Period, Defendant Bernhardt sold over $840,000 in shares of SentinelOne common stock on the basis of adverse MNPI.

21.     Defendant Charlene T. Begley ("**Begley**") has served as a member of the Board since January 2021. Begley also serves as Chair of the Company's Audit Committee.

22.     Defendant Aaron Hughes ("**Hughes**") has served as a member of the Board since May 2021. Hughes is a member of the Company's Audit Committee.

23.     Defendant Mark S. Peek ("**Peek**") has served as a member of the Board since May 2021. Peek is also a member of the Company's Audit Committee and Chair of the Compensation Committee.

24.     Defendant Ana G. Pinczuk ("**Pinczuk**") has served as a member of the Board since May 2022.  She is also a member of the Company's Nominating and Corporate Governance Committee.

25.     Defendant Danial Scheinmann ("**Scheinmann**") has served as a member of the Board since September 2015 and acts as the Company's Lead Independent Director. He is also Chair of the Nominating and Corporate Governance Committee and a member of the

Compensation Committee.

26.    Defendant Teddi Wardi ("**Wardi**") has served as a member of the Board since May 2019. Wardi is also a member of the Company's Compensation Committee.

27.    Defendant Jeffrey W. Yabuki ("**Yabuki**") served as a member of the Board from May 2021 until April 24, 2023. He also served as a member of the Company's Nominating and Corporate Governance Committee.

28.    Together, Defendants Begley, Hughes and Peek may be referred to herein as the "**Audit Committee Defendants**".

29.    Collectively, Defendants Weingarten, Bernhardt, Begley, Hughes, Peek, Pinczuk, Scheinmann, Wardi, and Yabuki are referred to herein as the "**Individual Defendants**."

## <u>SUBSTANTIVE ALLEGATIONS</u>

30.    SentinelOne is a cybersecurity company that claims to have pioneered the world's first AI-powered XDR platform with the goal of making cybersecurity defense truly autonomous.

31.    The Company's Singularity Platform purportedly instantly defends against cyberattacks, performing at faster speed, greater scale, and higher accuracy than otherwise possible from humans. The Singularity Platform provides organizations with a full suite of real-time threat prevention, detection, and remediation capabilities across all of their endpoints, cloud workloads, servers, operating systems, and user credentials.  It also offers multi-tenancy and can be deployed on a diverse range of environments that the Company's customers choose.

32.    According to SentinelOne's public filings, the Company generates substantially all of its revenue by selling subscriptions to the Singularity Platform. The Company offers three subscription tiers, which include Singularity Core, Singularity Control, and Singularity Complete.

33.    The Company claims that its "go-to market strategy" is focused on both acquiring

new customers and driving expanded usage of its platform by existing customers.

**A. SentinelOne's Revenue Recognition Policies**

34.     Per its most recent Form 10-K, filed on March 29, 2023 (the "**2023 10-K**"), SentinelOne recognizes subscription revenue ratably over the term of each customer's contract:

> We **generate substantially all of our revenue from subscriptions** to our Singularity Platform . . . Customers can extend the functionality of their subscription to our platform by subscribing to additional Singularity Modules. The nature of our promise to the customer under the subscription is to stand ready to provide protection for the duration of the contractual term. **As a result, we recognize revenue for these performance obligations ratably over the contractual term.** Premium support and maintenance and other Singularity Modules are distinct from subscriptions and are recognized ratably over the term as the performance obligations are satisfied.

35.     SentinelOne "generally invoice[s] [its] customers upfront upon signing for the entire term of the contract, periodically, or in arrears." Contract terms are typically one to three years, and payment terms "typically range between 30 to 45 days." SentinelOne treats the invoiced amounts "as deferred revenue on the consolidated balance sheets," and recognizes the associated revenue on SentinelOne's income statement "ratably over the term of the contract beginning on the date the customer is given access to our platform."

36.     Consequently, as explained in the 2023 10-K, "a substantial portion of the revenue [SentinelOne] report[s] in each period is attributable to the recognition of deferred revenue relating to agreements that we entered into during previous periods" which are still being serviced – and, as a result, "any increase or decrease in new sales or renewals in any one period will not be immediately reflected in [SentinelOne's] revenue for that period."

37.     Importantly, as the Company repeatedly noted through the Relevant Period, SentinelOne's "contracts are generally non-cancelable over the contractual term." This feature of the Company's contracts, coupled with the subscription nature of SentinelOne's business,

reportedly gave the Company "higher visibility" into customers' future spending than might otherwise be the case.

38.    The Company discloses that "substantially all" of its revenue stems from subscriptions to the Singularity Platform. With respect to revenue, the 2023 10-K notes that the Company's "arrangements may include fixed consideration, variable consideration, or a combination of the two." With respect to variable consideration, the 2023 10-K states it "is typically a function of transaction volume or another usage-based measure." SentinelOne recognizes revenue for variable consideration as follows:

> Depending upon the structure of a particular arrangement, we (1) allocate the variable amount to each distinct service period within the series and recognize revenue as each distinct service period is performed (i.e. direct allocation), (2) estimate total variable consideration at contract inception (giving consideration to any constraints that may apply and updating the estimates as new information becomes available) and recognizes the total transaction price over the period to which it relates, or (3) apply the 'right to invoice' practical expedient and recognize revenue based on the amount invoiced to the customer during the period.

39.    The Company, however, does not clarify which of its services involve variable (as opposed to fixed) consideration in its public filings.

**B.  The Company's Focus on Annualized Recurring Revenue (ARR)**

40.    Although SentinelOne recognizes revenue ratably over the course of a contract's term, it states that one of its key business metrics is Annualized Recurring Revenue, or "ARR." The 2023 10-K defines ARR as "the annualized revenue run rate of our subscription and capacity contracts at the end of a reporting period, assuming contracts are renewed on their existing terms for customers that are under contracts with us." In other words, ARR is represented to be comprised of the value of the underlying subscription contracts, active as of the date at which ARR is being calculated (*e.g.*, as of the end of a fiscal quarter) and normalized to an annual basis – *i.e.*, annualized. ARR is intended to represent how much revenue a company expects to receive from

recurring customers in the next 12 months, based on the services that its customers have committed to purchasing under the terms of their current contracts (assuming the customers renew on the exact same terms), and it is a relatively common metric among companies that have a SaaS business model.

41.     ARR is distinct from revenue. While SentinelOne recognizes revenue in accordance with GAAP, it states in the 2023 10-K that "ARR is an operational metric, and there is no comparable GAAP financial measure to which [SentinelOne] can reconcile this particular key metric." SentinelOne's 2023 10-K further states that "ARR is not a forecast of future revenue, which can be impacted by contract start and end dates and renewal rates." Though ARR is not a revenue projection, the two should track to an extent. As Defendant Bernhardt stated on the Company's June 1, 2023 earnings call, for example, "you would assume that about a quarter of ARR goes into revenue [each quarter], you know, absent some churn, absent some slower deployments, things like that, that are typical."

42.     Moreover, Defendants noted throughout the Relevant Period that ARR was linked to the Company's revenue guidance. For example, in a December 6, 2022 call with investors, Defendant Bernhardt explained in the context of the revenue guidance for the upcoming quarter: "While we don't specifically [guide] for ARR[,] being a subscription business, our year-over-year revenue and total ARR growth tracked closely. We expect that relationship to hold in Q4."

43.     As the Company notes in the 2023 10-K, SentinelOne relies on ARR "to help [SentinelOne] evaluate [its] business, identify trends affecting [its] business, formulate business plans, and make strategic decisions." The other two key business metrics cited by SentinelOne in the 10-K are both pegged to ARR in one way or another. They are: (1) the number of customers with ARR of $100,000 or more, and (2) the dollar-based net retention rate, or NRR, which

"measures the percentage change in our ARR derived from our customer base at a point in time." Like ARR, NRR is an operational metric for which there is no comparable GAAP financial measure.

44.     Accordingly, throughout the Relevant Period, Defendants encouraged investors to focus on ARR, and to consider it an accurate measure of SentinelOne's performance. SentinelOne's 2023 10-K, for example, stated: "We believe that ARR is a key operating metric to measure our business because it is driven by our ability to acquire new subscription and capacity customers and to maintain and expand our relationship with existing customers."

45.     Unbeknownst to investors, however, Defendants omitted from the Company's public statements through the Relevant Period that their ARR calculations included a component that was not part of its subscription contracts "on their existing terms." To the contrary, during the Relevant Period the Company expressly stated in each of its financial statements that "ARR is not a forecast of future revenue." As the Individual Defendants would belatedly disclose, SentinelOne was accounting for "increasing usage and consumption patterns by [its] large customers . . . real-time in quarterly ARR" during the Relevant Period, thereby inflating the ARR figures on which the Company encouraged the investing public to rely.

**C.  Defendants' Materially False and Misleading Statements and Omissions**

46.     On June 1, 2022, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended April 30, 2022 (the "**Q1 FY2023 10-Q**"). In the Q1 FY2023 10-Q, the Company defined ARR as: "the annualized revenue run rate of our subscription contracts at the end of a reporting period, assuming contracts are renewed on their existing terms for customers that are under subscription contracts with us." The Company further stated that "ARR is not a forecast of future revenue, which can be impacted by contract start and end dates and renewal rates."

47.     The Q1 FY 2023 10-Q also stated that SentinelOne had ARR of $339 million as of April 30, 2022, and that "ARR grew 110% year-over-year to $339.0 million as of April 30, 2022, primarily due to high growth in the number of new customers purchasing our subscriptions and to additional purchases by existing customers."

48.     Furthermore, the Q1 FY2023 10-Q stated that, as of April 30, 2022, the Company's "disclosure controls and procedures were effective at the reasonable assurance level." The Q1 FY2023 10-Q was signed by Defendant Bernhardt, and both Defendant Bernhardt and Defendant Weingarten certified the contents of the Company's Q1 FY2023 10-Q pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("**SOX**").

49.     The Company also published a letter to its shareholders on June 1, 2022. The letter stated, in relevant part:

> Our first quarter results demonstrate the combination of a robust demand environment for our leading cybersecurity platform and impressive execution across the board. We once again sustained triple-digit revenue and ARR growth with significant margin expansion, added a record number of new customers, and delivered record NRR. . . . Our Singularity XDR platform is stronger than ever, covering the essential enterprise attack surfaces – Endpoint, Cloud, and Identity security. . . .
>
> Our go-to-market teams delivered excellent results to begin our fiscal year. We set a new record in total organic customer additions, even larger than our seasonally strong Q4 FY22. In the first quarter, our ARR grew 100% year-over-year, driven by a combination of new and existing customers. . . .
>
> Our momentum with large enterprises was strong. We continue to see high growth among customers with ARR over $100k, which grew 113% year-over-year to 591.
>
> Our business mix from customers with ARR over $100k continued to increase as a result of success with larger enterprises, strategic channel partners, and increasing adoption of modules.

50.     Defendants Weingarten and Bernhardt largely repeated the same false and misleading statements regarding the Q1 ARR metrics during the Company's Q1 FY2023 Earnings Call on June 1, 2022.

51.     On August 31, 2022, the Company filed a quarterly report on Form 10-Q with the SEC,

reporting the Company's financial and operating results for the quarter ended July 31, 2022 (the "**Q2 FY2023 10-Q**"). In the Q2 FY2023 10-Q, the Company defined ARR as: "the annualized revenue run rate of our subscription and capacity contracts at the end of a reporting period, assuming contracts are renewed on their existing terms for customers that are under subscription contracts with us." The Company further stated that "ARR is not a forecast of future revenue, which can be impacted by contract start and end dates and renewal rates."

52.    The Q2 FY2023 10-Q also stated that SentinelOne had ARR of $438.6 million as of July 31, 2022, and that "ARR grew 122% year-over-year to $438.6 million as of July 31, 2022, primarily due to high growth in the number of new customers purchasing our subscriptions and to additional purchases by existing customers."

53.    Additionally, the Q2 FY2023 10-Q stated that, as of July 31, 2022, the Company's "disclosure controls and procedures were effective at the reasonable assurance level." The Q2 FY2023 10-Q was signed by Defendant Bernhardt, and Defendants Bernhardt and Weingarten both certified the contents of the filing pursuant to SOX requirements.

54.    Furthermore, Defendants Weingarten and Bernhardt repeated essentially the same false and misleading statements regarding the Q2 ARR metrics during the Company's Q2 FY2023 Earnings Call on August 31, 2022.

55.    On December 6, 2022, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended October 31, 2022 (the "**Q3 FY2023 10-Q**"). In the Q3 FY2023 10-Q, the Company defined ARR as: "the annualized revenue run rate of our subscription and capacity contracts at the end of a reporting period, assuming contracts are renewed on their existing terms for customers that are under subscription contracts with us." The Company further stated that "ARR is not a forecast of future revenue, which can be impacted by contract start and end dates and renewal rates."

56.     The Q3 FY2023 10-Q also stated that SentinelOne had ARR of $487.4 million as of October 31, 2022, and that "ARR grew 106% year-over-year to $487.4 million as of October 31, 2022, primarily due to high growth in the number of new customers purchasing our subscriptions and to additional purchases by existing customers."

57.     The Q3 FY2023 10-Q also stated that, as of October 31, 2022, the Company's "disclosure controls and procedures were effective at the reasonable assurance level." The Q3 FY2023 10-Q was signed by Defendant Bernhardt, and Defendants Bernhardt and Weingarten both certified the contents of the filing pursuant to SOX requirements.

58.     Defendants Weingarten and Bernhardt repeated the same false and misleading statements regarding the Q3 ARR metrics during the Company's Q3 FY2023 Earnings Call on December 6, 2022.

59.     On March 14, 2023, SentinelOne issued a press release titled "SentinelOne Announces Fourth Quarter Fiscal Year 2023 Financial Results." In the press release, the Company stated, in relevant part:

> "We continued to deliver leading growth and margin improvement, a result of stronger execution and our competitive position. Our ARR crossed half a billion dollars, and our global customer-base exceeded 10,000 - two major milestones. Our sights are set much higher," said Tomer Weingarten, CEO of SentinelOne. "We continue to strengthen our technology leadership. Once again, we are a leader in Gartner's Magic Quadrant for Endpoint Protection Platform and achieved the top ranking across all three Gartner's Critical Capabilities for Endpoint Protection Platforms."
>
> "Our fourth quarter results exceeded expectations across all key metrics, indicating strength of our competitive position and unit economics," said Dave Bernhardt, CFO of SentinelOne. "Evident in our fiscal year 2024 outlook, we expect to deliver compelling top line growth with consistent margin improvement. . . ."
>
> **Fourth Quarter Fiscal 2023 Highlights**
> *(All metrics are compared to fourth quarter of fiscal year 2022 unless otherwise noted)*
>
> - **Total revenue** increased 92% to $126.1 million, compared to $65.6 million.
>
> - **Annualized recurring revenue (ARR)** increased 88% to $548.7 million as of January 31, 2023.

- **Total customer count** grew about 50% to over 10,000 customers as of January 31, 2023. Customers with ARR over $100,000 grew 74% to 905 as of January 31, 2023. Dollar-based net revenue retention rate remained above 130%.

- **Gross margin:** GAAP gross margin was 68%, compared to 63%. Non-GAAP gross margin was 75%, compared to 66%.

- **Operating margin:** GAAP operating margin was (79)%, compared to (108)%. Non-GAAP operating margin was (35)%, compared to (66)%.

- **Cash, cash equivalents, and investments** were $1.2 billion as of January 31, 2023.

**Full Year Fiscal 2023 Highlights**
*(All metrics are compared to fiscal year 2022 unless otherwise noted)*

- **Total revenue** increased 106% to $422.2 million, compared to $204.8 million.

- **Gross margin:** GAAP gross margin was 66%, compared to 60%. Non-GAAP gross margin was 72%, compared to 63%.

- **Operating margin:** GAAP operating margin was (95)%, compared to (130)%. Non-GAAP operating margin was (49)%, compared to (85)%.

60.   In the same press release, the Company reported full fiscal year 2024 revenue guidance of between $631 million and $640 million.

61.   The Company also published a letter to shareholders on March 14, 2023, which stated, among other things:

Our Q4 results demonstrate strong execution and success in delivering high growth with substantial margin improvement. Our market position is strengthening across both endpoint and cloud security. Our ARR per customer expanded, NRR remained about 130%, and our win rates increased. Macroeconomic headwinds remained, yet we delivered excellent quarterly performance that exceeded our expectation across the board. . . .

ARR grew 88% year-over-year to $549 million, crossing the half-a-billion dollar mark. Revenue for fiscal year 2023 grew 106% year-over-year to $422 million. This is tremendous progress in terms of the scale and speed in which we achieved it. Our sights are set much higher. Once again, we exceeded the Rule of 50 in Q4, indicating strong unit economics and scalability of our business model. Our GAAP and non-GAAP gross margin expanded by 5 and 9 percentage points year-over-year, respectively. Similarly, our GAAP and non-GAAP operating margin expanded by 29 and 31 percentage points year-over-year, respectively. We are making meaningful progress toward our profitability targets as we strategically

balance investments with the pace of growth. . . .

62.     On March 29, 2023, the Company filed the 2023 10-K, reporting the Company's financial and operating results for the quarter and year ended January 31, 2023. In the 2023 10-K, the Company defined ARR as: "the annualized revenue run rate of our subscription and capacity contracts at the end of a reporting period, assuming contracts are renewed on their existing terms for customers that are under subscription contracts with us." The Company further stated that "ARR is not a forecast of future revenue, which can be impacted by contract start and end dates and renewal rates."

63.     The 2023 10-K also stated that SentinelOne had ARR of $548.7 million as of the end of January 31, 2023, and that "ARR grew 88% year-over-year to $548.7 million for fiscal 2023." Furthermore, Defendants Weingarten and Bernhardt repeated the same false and misleading statements regarding the FY23 ARR metrics during the Company's FY23 Earnings Call on March 14, 2023.

64.     Moreover, the 2023 10-K stated that the Company's "internal control over financial reporting was effective as of January 31, 2023."

65.     The 2023 10-K was signed by Defendants Weingarten, Bernhardt, Begley, Hughes, Peek, Pinczuk, Scheinmann, Wardi, and Yabuki.

66.     The statements set forth above, however, were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that: (i) SentinelOne lacked effective controls over accounting and financial reporting; (ii) the Company's ARR was overstated; (iii) the Company's ARR projections were inflated; and (iv) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

///

///

### THE TRUTH BEGINS TO EMERGE

67.     On June 1, 2023, the truth began to emerge. On that date, after the market closed, SentinelOne filed its 10-Q for its first quarter of fiscal year 2024 (the quarter ending April 30, 2023). In that 10-Q, SentinelOne disclosed, in relevant part, as follows:

> *As a result of the decline in usage and consumption in the quarter ended April 30, 2023, we changed our methodology of calculating ARR for consumption and usage-based agreements to reflect committed contract values as opposed to based on consumption and usage.* By making this change now, we expect future ARR and revenue growth to be more closely aligned. It should also reduce volatility in ARR compared to the prior methodology where usage and consumption changes could have a magnified impact on ARR. In addition, as part of our quarter-end review of ARR in connection with the preparation of our condensed consolidated financial statements for the quarter ended April 30, 2023, *we discovered some historical upsell and renewal recording inaccuracies relating to ARR on certain contracts, which we have corrected. As a result of the change in methodology and correction of historical inaccuracies, we made a one-time adjustment to ARR of $27.0 million or approximately 5% of total ARR, which we reflected in our total ARR as of April 30, 2023.* ARR for the prior periods in fiscal 2023 presented above have been adjusted based on the same percentage adjustment rate identified in the first quarter of fiscal 2024. This adjustment to ARR did not impact historical total bookings or revenue.

68.     The ARR adjustments were as follows:

| Fiscal Quarter Ending | Old ARR | New ARR | Difference |
|---|---|---|---|
| April 30, 2023 | n/a | $563,559,000 | n/a |
| January 31, 2023 | $548,652,000 | $521,652,000 | ($27,000,000) |
| October 31, 2023 | $487,427,000 | $463,440,000 | ($23,987,000) |
| July 31, 2023 | $438,640,000 | $417,054,000 | ($21,586,000) |
| April 30, 2022 | $338,962,000 | $322,281,000 | ($16,681,000) |

69.     SentinelOne's press release accompanying its 10-Q also disclosed the adjustment, stating that it had adjusted historical ARR "due to a change in the methodology for reflecting consumption and usage based agreements as part of ARR to reflect committed contract values" and "to correct some historical recording inaccuracies relating to ARR on certain contracts that were discovered as part of our review of ARR in the first quarter of fiscal 2024."

---

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

18

70.     In its quarterly letter to shareholders, also made public after the market closed on June 1, 2023, SentinelOne similarly attributed the ARR adjustment to (1) "lower usage and consumption trends by certain large customers" (which it connected to "the current macroeconomic conditions") and which had caused it to "change[] the methodology for calculating ARR for consumption and usage-based agreements to reflect committed contract values" so as to "reduce ARR volatility"; and (2) the correction of "historical recording inaccuracies relating to ARR classifications of certain contracts that we discovered as part of our review of ARR."

71.     On the earnings conference call with analysts later that day, Defendant Bernhardt further stated as follows:

> First, some context. In the past few years, **we had seen steadily increasing usage and consumption patterns by our large customers, which we accounted for real-time in quarterly ARR.** However, as the first quarter progressed, we experienced a **notable decline in usage, which continued in May.** In light of the current macro environment, we expect these lower usage and consumption trends to persist.
>
> Due to this new dynamic, **we elected to tighten the methodology for calculating ARR for consumption and usage-based agreements to reflect committed contract values.** This provides a cleaner view of growth for fiscal '24 and beyond. **By making this change now, we expect ARR and revenue to be more closely aligned.** It should also reduce volatility in ARR compared to the prior methodology, where usage and consumption changes could have a magnified impact on ARR.
>
> As we reviewed the methodology, we also discovered **historical upsell and renewal recording inaccuracies relating to ARR on certain subscription and consumption contracts,** which are now corrected. After considering these factors, this adjustment resulted in a onetime ARR reduction of $27 million or approximately 5% of ARR, resulting in Q4 fiscal '23 ending ARR of $522 million.
>
> We are applying a comparable estimated adjustment to the remaining quarters in fiscal year '23, which we believe is a reasonable approximation of the impact in those periods. Importantly, this adjustment did not impact historical revenue or bookings. We wanted to be transparent to address this upfront and move forward on a clearer path.

72.     Defendant Bernhardt went on to state that SentinelOne "expect[ed] revenue of about $141 million, up 38% year-over-year," and "net new ARR in the low $40 million range, consistent

with Q1." He added that SentinelOne "expect[ed] second half net new ARR to be higher than the first half, consistent with typical seasonality," and that for the full year SentinelOne "expect[ed] revenue of $590 million to $600 million, growing 41% at the midpoint" (as compared to Defendants' prior estimate of 51% growth at the midpoint made on the prior quarter's earnings call). He also stated that SentinelOne now expected "full year ARR to grow in the mid-30% range from the adjusted [FY 2023]-ending ARR of $522 million" (as compared to Defendants' prior estimate of 47% ARR growth made on the prior quarter's earnings call).

73.     In the Q&A portion of the June 1, 2023 earnings call, analysts expressed confusion and concern. One analyst asked whether "the slowdown in consumption and usage" was for "storage and query," adding, "Maybe you can explain the underlying product that's related to this consumption-based revenue…[A]s we look in our models and try to forecast out the revenue generated from ARR, is this going to be – does this basically remain out of the ARR equation now? [Is it] an extra layer of revenue we need to consider that's more variable in nature?"

74.     Defendant Bernhardt then said:

> When you asked specifically what's that about, ***it's about the data ingestion and the security data lake and the data set consumption products***. So those are approximately ***single digit of our total ARR***. But what we had been seeing historically was we were seeing customers that were signing up for contracts, using the data in excess of what they were committed to, renewing early, and we were reflecting that in the ARR balance.

75.     Defendant Bernhardt also attempted to explain why none of the changes would require the Company to restate its financials:

> So we believe that this is -- this, going forward, it's going to reduce the quarterly ARR fluctuations. ***It's going to more correlate ARR and revenue.*** And that's the reason that we did this. The reason it doesn't change any historical bookings, in terms of the other side of this, which was historical upsell and renewal inaccuracies, what we were seeing was ***we had upsell motions that included a renewal, and we were adding that to the historical ARR versus adding just the upsell component of it. This was an error in our CRM***. We have fixed this and should not have that

error going forward. That's why it didn't affect revenue, didn't affect overall total bookings, didn't affect cash flows, didn't affect the income statement. But what it did do is *it set external expectations for what revenue should be going forward*, both externally and internally, that's why we made this adjustment now.

76.     According to Defendants, these "renewal inaccuracies" occurred in instances where SentinelOne "had upsell [situations] that included a renewal, and [SentinelOne] w[as] adding that [the underlying contract renewal] to the historical ARR versus adding just the upsell component of it" when calculating ARR – thereby effectively double counting the renewed contract value.

77.     Defendants claimed that they came across the double-counting issue while assessing the impact of their "consumption and usage" assumptions on ARR, which would place their discovery of the issue sometime after they filed the 2023 10-K on March 29, 2023.

78.     In any event, none of this directly answered the analyst's original question, which was how this "consumption and usage" factored into SentinelOne's business. When a different analyst asked for clarification on the guidance change, Defendant Weingarten offered some additional explanation:

The third factor that we see in play is that consumption dynamic. *I mean consumption is something that we've had in our ARR. It's something that is part of our ongoing operations*, obviously. So taking out consumption from ARR obviously forces us to also take the guide down and really not consider consumption as part of our go-forward but only as upside, as I mentioned.

79.     Despite Defendant Weingarten's attempt to explain, the Company never adequately disclosed that consumption had been included in SentinelOne's ARR calculations. In fact, the very first analyst question on the June 1, 2023 call was about what "consumption and usage" meant, with an analyst asking, "Is this for kind of storage and query? Maybe you can explain the underlying product that's related to this consumption-based revenue . . .[Is this] kind of an extra layer of revenue we need to consider that's more variable in nature?"

80.     Another analyst asked whether the "data ingestion piece" (which was "a smaller

part of the business") of the "negative surprise" forebode "broader challenges coming in the business with the logic saying, hey, it's easier to shut off consumption quickly, and we'll get to the contractual stuff later and ultimately start shutting it off."

81.     Defendant Weingarten's answer was not illuminating:

I think these are two completely separate things. . . . Consumption, in its nature, is just more volatile. And I think that for companies out there, when they're under the gun to save, obviously, something as intangible as data is something that they can start thinking twice about. That's not the same for their core security posture, and that is something that we've seen very, very stable over time.

***Even if we imply some factor of rightsizing into it, that doesn't create that same volatility that an ad hoc consumption model would have.*** Obviously, ***these are multiyear contracts. Obviously, these are tied specifically to the amount of people you have in the organization.*** Even if you have some volatility in that, it is not even close to the volatility that you can have with data volumes. And that's why, once again, to kind of remove that volatility, we remove that from our ARR projections.

82.     In response to another analyst question, Defendant Weingarten made remarks that seemed to directly conflict with Defendant Bernhardt's statement that "the data ingestion and the security data lake and the data set consumption products" were just a "single digit of [SentinelOne's] total ARR," stating:

***I think generally, when we look at it, we see kind of the end of the quarter is the point where we started noticing more and more pronounced consumption changing.*** To us, that was a point where couple that with a couple of deals slips and suddenly, you're looking at a very different outcome for the quarter. So I think, generally, if you just look at our new and upsell target for the quarter, it was pretty much in line with what we expected.

***But when you couple that with that downsizing of consumption, then you just arrive at a very, very different result.*** And to us, I mean, once again, win rates sustained, revenue still growing about 70%. I think if you take out that consumption element, I mean, things would have looked very, very different. So that, I think, is kind of the reason where parts of the business here are really humming. And suddenly, we saw this, which, frankly, we were surprised by and we were surprised by the magnitude, and that's where we are today.

83.     Analysts continued to press Defendants for answers, with another analyst asking

what "the main driver of just you missing the Q1 revenue guidance" was, because Defendants had just provided guidance on March 14 "and revenue is mostly ratable." In short, the analyst wanted to know "why this won't happen again." Defendant Weingarten responded:

> I'll try and iterate for Dave [Bernhardt] because it's going to be the third time. *But basically, the ARR adjustment that we've done was realizing that both we've had consumption is kind of an ad hoc element to our ARR, which basically drives up ARR as consumption goes up, but it drives down ARR significantly when consumption is not continuing to grow.* In the past couple of years, consumption for us was always on the up and up, and it created that overstatement of ARR, so to speak, which created an expectation for revenue for us internally as well.

> So when the quarter ended, the dust settled, when he started kind of figuring out, hey, why aren't we seeing that revenue, a big part of it was the ARR was reflecting consumption that was now going down. And that impacted what we should have seen in revenue. *And couple that with, again, some CRM inaccuracies that Dave mentioned as well, and that was mainly the reason for the revenue miss.*

> *Outside of that, the ARR for the quarter was roughly in line with what we expected, minus again that consumption downsizing.* So all in all, a lot of it was cleaned and will never happen again, given that rebasing of ARR and the removal of consumption from the base.

84.    Analysts reacted harshly to SentinelOne's disclosures. For example, in a report issued June 2, 2023, BTIG downgraded SentinelOne shares to "Neutral" from "Buy," stating that "S's Q1/April print was disappointing on multiple levels and quite frankly hard to dissect." As the report further noted:

> S grew delivered ARR of $564MM / +75% y/y vs. our estimate of $591MM /+74% (Street $594MM). The $27MM shortfall relative to our model was entirely due to a reclassification that reduced the starting point of ARR in FQ4…. *We would like to say that the issues facing S are just a weak macro. But given the degree of the Q1 miss after the company initially guided in mid-March and the magnitude of the guide down, it simply feels like something else is at play here.* Admittedly the stock appears cheap, but concerns on increased competition from Microsoft (MSFT, Not Rated) and CrowdStrike (CRWD, Buy, $188 PT) are going to be hard to shake near term. And since we are cutting our FY24 / FY25 revenue estimates by 6% and 18%, respectively, *the narrative is too hard for us to defend.*

> BTIG also noted that SentinelOne's prior reporting "did not impact reported revenue, billings or bookings in historical periods," but had caused SentinelOne's "view of its Q1 starting point for revenue to be too high."

85. Guggenheim also reduced its price target for SentinelOne shares from $24.00 to $16.00, and issued a report expressing a strong negative reaction to Defendants' June 1, 2023 disclosures:

> **Key Message**: SentinelOne reported a ***surprisingly weak quarter*** as necessary revisions to historical ARR figures ***clearly impeded Management's ability (and ours) to forecast revenue and ARR with any sort of accuracy***. This, no doubt, will lead to a ***loss of confidence*** and ***has us questioning internal controls and whether ARR is a reliable metric*** to base our forecasts on going forward. . . . ***[I]t's hard to have any confidence in forecasts at this point***.

86. Similarly, Barclays Equity Research took note of the "surprise miss" on ARR and lowered its price target sharply from $22.00 to $15.00.

87. Moreover, in a June 13, 2023 piece published by Barclays Equity Research after analysts had spoken with Defendant Bernhardt, Barclays reported that Defendants had "essentially double counted the renewal component in the CRM system, which was used for sales force automation/compensation." Defendants traced the double-counting to inaccuracies in the Salesforce CRM.

88. Ultimately, in response to Defendants' June 1, 2023 disclosures and related analyst commentary, SentinelOne's share price dropped more than $7.00 per share – from $20.72 to $13.44 per share at the close of trading on June 2, 2023 – a single-day drop of ***more than 35%***.

## FIDUCIARY DUTIES

89. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe SentinelOne and its stockholders' fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage SentinelOne in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of SentinelOne

and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

90.     Each Individual Defendant owes and continues to owe SentinelOne, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

91.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of SentinelOne, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with SentinelOne, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

92.     To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of California and the United States, and

pursuant to SentinelOne's own Code of Business Conduct and Ethics;

(c)     Conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(d)     Remain informed as to how SentinelOne conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

(e)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of SentinelOne and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)     Maintain and implement and adequate and functioning system of internal legal, financial, and management controls, such that SentinelOne's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(g)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     Truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

93.     The Individual Defendants, because of their advisory, executive, managerial, and directorial positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by SentinelOne.

94.     At all times relevant hereto, the Individual Defendants were the agents of each other and of SentinelOne and were at all times acting within the course and scope of such agency.

## Duties Pursuant to the Company's Code Business Conduct and Ethics

95.     The Individual Defendants, as officers and/or directors of SentinelOne, were bound by the Company's Code of Business Conduct and Ethics (the "Code of Conduct").[4]

96.     The Code of Conduct provides that it "applies to [its] employees, contractors, consultants, agents, representatives, officers, and members of [the Company's] Board of Directors."

97.     It also provides that, among other things:

(a)     "[e]veryone at the Company is expected to comply with the law."

(b)     Employees do not "buy or sell securities based on inside information . . . [as] using material nonpublic information to trade securities is never acceptable."

(c)     Anyone who "contribute[s] in any way to the preparation or verification of [the Company's] financial statements and other financial information . . . must ensure that [the Company's] books, records and accounts are accurately maintained." They must also "cooperate

---

[4] SentinelOne, Inc.'s Code of Business Conduct and Ethics.
https://s28.q4cdn.com/399982429/files/doc_downloads/governance/06/sentinelone-code-of-business-conduct-and-ethics.pdf.

fully with [the Company's] finance department and its independent public accountants and counsel. Further, they also must "[b]e familiar with and comply with [the Company's] disclosure controls and procedures and [its] internal control over financial reporting[,]" and "Take all necessary steps to ensure that all filings with the Commission and all other public communications about [the Company's] financial and business condition provide full, fair, accurate, timely and understandable disclosure."

98.     The Individual Defendants failed to adhere to the Code of Conduct when they failed to "take all necessary steps to ensure that all filings with the Commission and all other public communications about [the Company's] financial and business condition provide full, fair, accurate, timely and understandable disclosure" with respect to the Company's disclosure of its ARR.

***Duties Pursuant to Audit Committee Charter***

99.     In addition to the duties set forth in the Code of Conduct, the Audit Committee Defendants, who served on the Audit Committee during the Relevant Period, owed specific duties to SentinelOne under the Audit Committee Charter, as set forth in part below.

100.     Specifically, the Audit Committee Charter noted that the purpose of the Audit Committee is to assist the Board in fulfilling its oversight responsibilities relating to "the Company's accounting and financial reporting processes and internal controls, including audits and the integrity of the Company's financial statements" and "compliance by the Company with legal and regulatory requirements," among other things.[5]

101.     The Audit Committee was also responsible for "review[ing] and discuss[ing] with

---

[5] *See* SentinelOne, Inc., Audit Committee Charter (May 28, 2021),
https://s28.q4cdn.com/399982429/files/doc_downloads/governance/Audit-Committee-Charter.pdf.

management and the Independent Auditors, and the Company's quarterly and annual financial results, earnings press releases and earnings guidance provided to analysts and rating agencies, and other public announcements regarding the Company's operating results."[6]

### BREACHES OF DUTIES

102.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of SentinelOne, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

103.    The Individual Defendants breached their fiduciary duties by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders.

104.    The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee SentinelOne's public statements and internal control function.

105.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of SentinelOne, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, SentinelOne has expended, and will continue to expend, significant sums of money.

---

[6] *Id* at 2.

**DAMAGES TO SENTINELONE**

106.     As a direct and proximate result of the Individual Defendants' conduct, SentinelOne has expended and will continue to expend significant sums of money.

107.     Such expenditures include, but are not limited to, legal fees associated with the aforementioned Securities Class Action filed against the Company for violations of the federal securities laws. SentinelOne will incur additional expenditures and economic harm due to, among other things, amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations, and payments associated with the aforementioned issues.

108.     As a direct and proximate result of the Individual Defendants' conduct, SentinelOne has suffered and will continue to suffer a loss of reputation and goodwill, and a "lair's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

109.     Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

110.     Plaintiff brings this action derivatively in the right and for the benefit of SentinelOne to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of SentinelOne, unjust enrichment, and violations of Section 20(a) of the Exchange Act.

111.     SentinelOne is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

112.     Plaintiff is, and has been continuously at all relevant times, a stockholder of SentinelOne. Plaintiff will adequately and fairly represent the interests of SentinelOne in enforcing

and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

113.    Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

114.    A pre-suit demand on the Board of SentinelOne is futile and, therefore, excused. At the time of filing this action, the Board consists of seven directors: defendants (i) Begley, (ii) Hughes, (iii) Peek, (iv) Pinczuk, (v) Scheinmann, (vi) Wardi, and (vii) Weingarten (the "**Director Defendants**").

115.    Plaintiff did not make a demand on the Board prior to bringing this stockholder derivative suit because, as set forth below, at least half or a majority of the Board (*i.e.*, at least four directors) faces a substantial likelihood of personal liability and is therefore incapable of making an independent and disinterested decision to bring the claims herein.

116.    Demand is excused as to all the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they engaged, knowingly or recklessly, to make and/or cause the Company to make false and misleading statements and omissions of material facts regarding the Company's ARR, which the Company describes as a key business metric. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

117.    The Directors Defendants also signed the 2023 10-K, which contained false and materially misleading statements and/or omitted material facts, as alleged herein. Accordingly, all seven Director Defendants made false and misleading statements contained in the 2023 10-K,

breach of their fiduciary duties, and face a substantial likelihood of liability. Thus, demand upon all the Director Defendants is futile and, therefore, excused.

A.    **The Board Faces a Substantial Likelihood of Liability**

118.    Demand is excused as to the entire Board, as each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

119.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, demand would be futile, and thus is excused, as the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested.

120.    The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs.

121.    Additionally, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

122.     Each of the Director Defendants authorized, signed, and/or permitted the false and misleading statements described herein, including the Company's most recent 10-K, the 10-Q for Q1 FY 2023, 10-Q for Q2 FY 2023, and 10-Q for Q3 FY 2023, to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

123.     The Director Defendants, as members of the Board, were and are subject to SentinelOne's Code of Business Conduct and Ethics. The Director Defendants violated the Code of Business Conduct and Ethics because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability to breaching their fiduciary duties, and therefore demand upon them is futile.

124.     Demand is further excused as to Weingarten because he received a material personal benefit from insider trading on the basis of adverse MNPI, as described herein, and was unjustly enriched thereby. Specifically, Weingarten reaped over $23.2 million from insider sales. Moreover, Weingarten faces a substantial likelihood of liability because he engaged in this insider trading with scienter.

125.     Furthermore, Weingarten is SentinelOne's co-founder, has been on the Board since January of 2013, and was the Company's CEO at all relevant times. Therefore, as the Company concedes, he is not independent under Nasdaq listing rules. As an employee of the Company, Weingarten also derives substantially all of his income from his employment with SentinelOne. Specifically, for the 2022 fiscal year, Weingarten was entitled to $95,395,534.00 in total compensation. For the 2023 fiscal year, Weingarten was entitled to $13,522,362.00 in total

compensation. Accordingly, could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or his fellow members of management with whom he works on a day-to-day basis.

126.    Moreover, as CEO, Weingarten had the power and authority to control the contents of the Company's financial filings, press releases, and other market communications. He attested to being involved in the preparation and delivery of the Company's SEC filings and press releases alleged herein to be misleading and had the ability to prevent their release and have them be corrected. Weingarten knew or recklessly disregarded that the adverse facts regarding the Company's ARR had not been disclosed to and were being hidden from the public. Weingarten signed the 2023 10-K and thus personally issued the materially misleading statements and concealed the material facts described herein. As a result, Weingarten would be disinterested in a demand regarding his own wrongdoing, and demand is futile as to him.

127.    Weingarten is also a defendant in the Securities Class Action and faces a substantial likelihood of liability; therefore, demand on Weingarten is futile.

128.    Defendant Begley has served as a Company director since January 2021. The Company provides Defendant Begley with significant compensation for her role as a director as detailed above. As such, Defendant Begley cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability and threaten her livelihood. This lack of independence and the financial benefits received by Defendant Begley renders her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarding her duties to protect corporate assets. As a result, Defendant Begley

breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Begley is futile and excused.

129. Defendant Hughes has served as a Company director since May 2021. The Company provides Defendant Hughes with significant compensation for his role as a director as detailed above. As such, Defendant Hughes cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Hughes renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarding his duties to protect corporate assets. As a result, Defendant Hughes breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Hughes is futile and excused.

130. Defendant Peek has served as a Company director since May 2021. The Company provides Defendant Peek with significant compensation for his role as a director as detailed above. As such, Defendant Peek cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Peek renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarding his duties to protect corporate assets. As a result, Defendant Peek breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor

disinterested. Thus, demand upon Defendant Peek is futile and excused.

131.    Defendant Pinczuk has served as a Company director since May 2022. The Company provides Defendant Pinczuk with significant compensation for role as a director as detailed above. As such, Defendant Pinczuk cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability and threaten her livelihood. This lack of independence and the financial benefits received by Defendant Pinczuk renders her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarding her duties to protect corporate assets. As a result, Defendant Pinczuk breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Pinczuk is futile and excused.

132.    Defendant Sheinmann has served as a Company director since May 2015. The Company provides Defendant Sheinmann with significant compensation for his role as a director as detailed above. As such, Defendant Sheinmann cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Scheinmann renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarding his duties to protect corporate assets. As a result, Defendant Scheinmann breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Scheinmann is futile

and excused.

133.    Defendant Wardi has served as a Company director since January 2021. Through his position as a Board member of the Company and as Managing Director of Insight Partners, Defendant Wardi cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Wardi through his position at Insight Partners, which controls a staggering 47.66% voting power in the Company renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarding his duties to protect corporate assets. As a result, Defendant Wardi breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Wardi is futile and excused.

134.    Furthermore, Begley, Hughes and Peek have served as members of the Audit Committee during the relevant period. As such, they are responsible for the integrity of SentinelOne's financial statements. Specifically, the Audit Committee Charter provides that the Audit Committee is responsible for:

> [T]he Company's accounting and financial reporting processes and internal controls, including audits and the integrity of the company's financial statements; the qualifications, independence and performance of the company's independent auditors; the design, implementation and performance of the Company's internal audit function; risk assessment and management; and compliance by the Company with legal and regulatory requirements.

In their capacities as Audit Committee members, Begley, Hughes, and Peek reviewed and approved the materially misleading statements and allowed them to be disseminated in SentinelOne's SEC filings and other disclosures. Thus, Begley, Hughes, and Peek breached their

fiduciary duties, are not disinterested, and demand is excused as to them.

## **FIRST CLAIM**

### **Against the Individual Defendants**
*for Violations of Section 20(a) of the Exchange Act*

135.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

136.    The individual defendants, by virtue of their positions with SentinelOne and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of SentinelOne and officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause SentinelOne to engage in the illegal conduct and practices complained of herein.

137.    Plaintiff, on behalf of SentinelOne, has no adequate remedy at law.

## **SECOND CLAIM**

### **Against Individual Defendants**
*for Breach of Fiduciary Duties*

138.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

139.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of SentinelOne's business and affairs as directors and/or officers of the Company.

140.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

141.    The Individual Defendants' conduct set forth herein was due to their intentional or

reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of SentinelOne.

142.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

143.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

144.    The Individual Defendants failed to implement any Board-level oversight over inaccuracies regarding the Company's financial filings and omissions of the Company's Consumption and Usage estimates in its ARR calculations as well as its double counting in certain subscription and consumption contracts.

145.    Further, Weingarten and the remaining directors have specific fiduciary responsibilities as defined by the Company's corporate governance documents that, had they been discharged in accordance with the Director Defendant's obligations, would have necessarily prevented the misconduct and the subsequent harm to SentinelOne.[7]

146.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

147.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public

---

[7] SentinelOne, Inc.'s Corporate Governance Guidelines Policy.
https://s28.q4cdn.com/399982429/files/doc_downloads/governance/06/sentinelone-corporate-governance-guidelines-policy.pdf.

statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

148.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

149.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

150.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, SentinelOne has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

151.    Plaintiff, on behalf of SentinelOne, has no adequate remedy at law.

///

///

///

### THIRD CLAIM

### Against Individual Defendants
*for Unjust Enrichment*

152.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

153.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of SentinelOne.

154.    The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from SentinelOne tied to the performance or artificially inflated valuation of SentinelOne, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

155.    Plaintiff, as a stockholder and a representative of SentinelOne, seeks restitution from the Director Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

156.    Plaintiff, on behalf of SentinelOne, has no adequate remedy at law.

### PRAYER FOR RELIEF

**FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.  Declaring that Plaintiff may maintain this action on behalf of SentinelOne, and

that Plaintiff is an adequate representative of the Company;

B.  Finding that any demand upon the Board concerning the wrongdoing complained of herein would be futile;

C.  Finding that the Individual Defendants have breached their fiduciary duties to SentinelOne;

D.  Finding that the Individual Defendants have been unjustly enriched;

E.  Determining and awarding to SentinelOne the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

F.  Directing SentinelOne and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect SentinelOne and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1)  A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

2)  A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

G.  Awarding SentinelOne restitution from Individual Defendants;

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

H.  Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

I.   Granting such other and further relief as the Court may deem just and

proper.

Dated: March 29, 2024

Respectfully submitted,

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**

By: _____*/s/ Betsy C. Manifold*_____
        BETSY C. MANIFOLD

RACHELE R. BYRD
ALEX J. TRAMONTANO
FERDEZA ZEKIRI
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com
zekiri@whafh.com

GREGORY M. NESPOLE
DANIEL TEPPER
CORREY A. SUK
SIDHARTH KAKKAR
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 17th Floor
New York, NY 10004
T. 212.363.7500
F. 212.363.7171
gnespole@zlk.com
dtepper@zlk.com
csuk@zlk.com
skakkar@zlk.com

*Attorneys for Plaintiff*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

43

## VERIFICATION

I, JOEL NEWMAN, declare that I have reviewed the Verified Stockholder Derivative Complaint ("Complaint") prepared on behalf of SENTINELONE, INC. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of SENTINELONE, INC. common stock at all relevant times.

Date: March 28, 2024

_____

Joel Newman